REGINA v. DUNLOP S. S. CO., Limited.

(District Court, E. D. Pennsylvania. March 26, 1904.)

No. 1.

**1. SHIPPING—INJURY OF STEVEDORE—LIABILITY OF SHIP.**

Where a ship in port had been for some days in the hands of contracting stevedores, who had discharged her, and were also to reload her, the vessel is not liable for the death of a stevedore, who came on board, with others, to assist in loading, and fell through a hatchway, the cover to which had been replaced by the discharging stevedores, and, so far as appeared, was in the condition they left it, and where the evidence did not establish any defect in any part of the hatch covering, but that the negligence, if any, was in the manner in which it had been replaced by the discharging stevedores.

**2. WRONGFUL DEATH—ACTION FOR DAMAGES—CONTRIBUTORY NEGLIGENCE.**

Deceased, a stevedore, was engaged, with others, in removing a hatch cover on a ship preparatory to loading cargo. There was an athwartship beam across the center of the hatchway, having cleats on the sides, on which rested the ends of fore-and-afters, upon which were placed the sectional covers. The covers had been removed from one-half the hatchway, and deceased was directing the removal of the center fore-and-after on that side by means of a fall and tackle operated by a winch. When the winch began to hoist, the outer end of the piece was raised first, causing it to bind, and deceased, who was standing on the covers of the other section, signaled the winchman to apply more power; the result being that the fore-and-after came out with a jump, causing the athwartship beam to spring outward sufficiently to permit the other half of the cover, on which deceased stood, to fall into the hold, whereby he was killed. *Held,* that he was clearly guilty of negligence in standing where he was, without necessity, while the extra power was applied, which precluded a recovery for his death under the Pennsylvania statute; the settled law of the state being that contributory negligence defeats a recovery thereunder.

In Admiralty. Action for death of stevedore.

John A. Toomey, for libelant.

Convers & Kirlin and John M. Woolsey, for respondent.

J. B. McPHERSON, District Judge. The libelant is the widow of Vincenzo Regina, a laboring stevedore, who was killed on December 21, 1902, by a fall into the hold of the British steamship Queen Eleanor. The vessel had arrived at Philadelphia from Japan early in the month, and, having discharged a cargo of jute at Girard Point, was lying at Point Breeze, in the Schuylkill river, about to be loaded with case oil for her outward voyage. Her inward cargo had been discharged by Murphy & Co., contracting stevedores, by whom, also, the oil was to be put on board. The stevedores who discharged the cargo were not the same who were employed to load and stow the oil, and Regina had not been upon the ship while she was lying at Girard Point. He had, therefore, not been present when the stevedores closed No. 1 hatch after all the jute had been taken out. Nothing more remained for them to do, except to whitewash and otherwise prepare the holds to receive the outward cargo. This occupied three or four days after the hatch was closed; but, while the wooden covers were probably taken off during this interval, in order to admit the light, the athwart-

ship beam and the fore-and-afters do not seem to have been disturbed. The relevant facts concerning the covering of the hatch are thus stated in the brief of libelant's proctors:

"No. 1 hatch was located at the fore end of the ship, at the after part of the forecastle, being 16 feet in length by 14 feet in width, and was surrounded by a coaming about 2½ feet high. An athwartship iron beam, ⅜ of an inch thick, 4 feet deep in the center, narrowing to 3 feet on the sides, extended across the whole width of the middle of the hatch. This beam fitted into angle iron slots riveted on the sides of the hatch coaming, with lips on top to prevent it from dropping. On each side of the beam, and on the fore and aft ends of the hatch coamings, three cleats were riveted, one in the center and one on each side, at an equal distance between the center of the beam and the sides of the hatch. The cleats in the center received the center fore-and-afters, which were of iron 8½ inches deep by ⅜ of an inch thick, and those on the side the smaller fore-and-afters. The center fore-and-afters had a ridge of iron on top 3 inches wide, and their rest on the bottom of the cleats was only 1½ inches. The 16 wooden hatch covers. 7 feet by 2 feet, extending from the center fore-and-afters, rested in rabbets on the center fore-and-afters and in the hatch coamings. The hatch thus made up was divided by the athwartship beam into a fore and aft section, each containing a center and two side fore-and-afters. When in proper condition the ends of all the fore-and-afters were marked with the letters 'P' or 'S,' and numbers to indicate on which side of the hatch they belonged. They would not fit in any other place."

The negligence charged against the ship is:

"(1) In not properly fitting and securing the said cross-beam of hatch No. 1, so that it would not spring from its position when removing the hatch.

"(2) In not properly repairing, securing, and fitting the cross-beam, fore-and-afters, strong-backs, and coverings of said hatch, which the owners and masters of said steamship knew to be unsafe and dangerous to all who had occasion to move them.

"(3) In not warning the said stevedores of the dangerous and defective condition of the said hatch No. 1."

To support these averments some testimony was taken, which, if it is all competent and is to be accepted as controlling, is said to prove the following facts (I quote again from the libelant's brief):

"Previous to coming to Point Breeze the vessel had discharged her inward cargo at Girard Point, upon the completion of which several of the stevedores started to close up the hatch. They attempted to put in the center fore-and-afters of No. 1 hatch, but were unable to do so. These fore-and-afters were so large that they would not fit, and the marks which should have been made on them to indicate where the ends were to be fitted had been obliterated. The stevedores being unable to put them in place, the mate of the ship called the ship's carpenter to fit them in. By the carpenter's directions the stevedores lifted the fore-and-afters of both sections to the places designated by him. He then took a sledgehammer, and after considerable hammering he finally forced them into the cleats, saying: 'We will have to put them in any way. * * * I will make them go in.' The stevedores took no part in this forcing process, nor were the fore-and-afters disturbed by them in any way until the vessel came around to Point Breeze to take in her outward cargo. The stevedores who discharged the vessel were ordinary laboring men, while those employed with Regina to load the cargo were skilled men working under different foremen, and did not come aboard until five or six days after the others had left.

"The marks on all of the fore-and-afters of all of the hatches had become obliterated and the hatch covers needed renewing. The ship's carpenter had been engaged for a long time in restoring them; that is, while the vessel had been making a voyage from New York to Japan and return, stopping at several ports. At the time the vessel was discharging at Girard Point he was

engaged in marking the fore-and-afters belonging to No. 2 hatch. The renewal of the wooden covers of No. 1 hatch had been nearly completed, but the obliterated marks of the fore-and-afters had not yet been restored.

"The mate knew that No. 1 hatch was dangerous, and when Regina fell into the hold said: 'I told you men to be careful about these No. 1 hatches.' As a matter of fact, although he knew that the hatch was out of order, he gave no notice of it to any of the stevedores. On the contrary, he denied that the hatches were out of order at the time, and maintained that none of the ship's crew touched them while the vessel was in Philadelphia."

I am by no means satisfied, however, that these are the facts, nor' that there was anything wrong with the hatch. On the contrary, I think the decided weight of the evidence shows that the athwartship beam, the fore-and-afters, and the wooden covers of the hatch were all in good order, properly constructed, and fitting snugly into their appropriate places. In my opinion, the accident was in part due to the carelessness of the discharging stevedores in failing to put the side fore-and-afters into place, thus leaving the hatch covers to be supported entirely by the coaming and by the center fore-and-afters. It is no doubt a common practice among stevedores not to use the side fore-and-afters while the vessel is in port. To put them in requires more trouble to be taken twice a day, and, rather than do the additional work, the men accept the chance that nothing will happen. It seems to me to be proved that the accident in question occurred in the following manner: When the stevedores came to work at 7 o'clock in the morning, the side fore-and-afters were lying upon the deck, close to the hatch, so that the men had notice of the fact that they were not in use. They asked the mate for a wire forestay, which seems to have been taken down before the vessel came into port, to which a block and fall might be attached to be used in uncovering the hatch. The mate refused the request, as he did not believe the stay to be rigid enough to be used with safety; but in some way that is not explained in the testimony the stay was obtained, and the block and fall were attached. The wooden covers of the after section of the hatch had been taken off, and Regina, who was standing on the covers of the forward section, fastened the fall around the center fore-and-after of the after section, but probably at some point aft the middle. When the winch began to hoist, the after end of the fore-and-after was lifted first, its forward end was thereby pushed into the narrow slot in the athwartship beam in which it rested, and was jammed there sufficiently tight to pull the beam out of line far enough to disengage the after end of the forward fore-and-after, and thus to precipitate Regina and most of the covers of the forward section of the hatch into the hold. The jerk of the wire stay may have contributed to the result. The libelant's witnesses testify that the fore-and-after stuck tight, and that Regina signaled to the winchman to apply more power; the result being that the fore-and-after came out with a jump. If the side fore-and-afters had been in place, the probability is, I think, that the covers would still have had sufficient support, and the accident would not have happened. That they were not in place was not the fault of the ship. Regina's employers had complete control of the work of opening and closing the hatches, and the facts do not disclose any duty on the part of the ship to oversee, or interfere with, their method of carrying out their

contract. There being no negligence on the part of the ship, the libelant is not entitled to recover.

But there is another ground, also, on which recovery must be denied, namely, the contributory negligence of the decedent. The right of action depends entirely on the Pennsylvania acts of 1851 (sections 18 and 19; P. L. 674) and of 1855 (P. L. 309); and I think it is well settled that in such a case the right can only be enforced subject to the limitations that are imposed upon it by the legislature and by the courts of the state. The Edith, 94 U. S. 518, 24 L. Ed. 167; The Canary (C. C.) 22 Fed. 532; The A. W. Thompson (D. C.) 39 Fed. 115. It is so well known that in the courts of Pennsylvania the contributory negligence of the decedent defeats the right of recovery, even although the defendant may have been also negligent, that no citation of authority is needed. In the case under consideration, it seems to me to be a point beyond serious controversy that the decedent was negligent in standing on the covers of the hatch while the fore-and-after was being removed. If he had stepped down upon the deck, as he directed a fellow workman to do just before the accident, he would have been perfectly safe; but he chose to stay upon the hatch, and to take the risk that something might go wrong. An unusually similar case, The State of Maryland v. Westoll (D. C.) 106 Fed. 233, was decided in the district of Maryland a few years ago, and I shall take the liberty of adopting a part of Judge Morris' very apposite opinion as my own. On page 236, he speaks of the hatch and the accident as follows:

"This was a large opening, the covers of which were sustained by a framework of heavy beams and rods, made so as to be readily taken apart or assembled together, and necessarily constructed so that, when all were fitted together, every part helped to sustain and keep in place every other part. It was this structure which the stevedores were engaged in taking apart with the aid of the power of the steam winch. The testimony for the respondents in this case shows that there is always risk in a man standing upon one portion of such a structure when the other portions are being pulled out by a winch, and some contracting stevedores testify that they do not allow their men ever to do it, if they see them. Undoubtedly it is done, but it is known to be attended with danger; and in a recent case of a quite similar accident I held, upon the testimony then before me, that it was negligence in a seaman to do this very same thing. The danger is so obvious that it scarcely needs explanation from persons having special knowledge.

"It is a peculiarity of this case that there was a warning to Dombroska of a special danger in his remaining standing on the hatch covers. When the first pull of the steam winch failed to lift the fore-and-after, it was plain it was held by something, and it was to be supposed, when he called for extra power sufficient to pull the beam out, there would be a recoil. There were several things which would account for the fore-and-after not lifting. One would be that it was too long, and had been forced in between the two cross-beams on which it rested; another would be that it was too long, and the end bound against the end of the fore-and-after on which Dombroska was standing; another would be that the fall of the tackle was pulling on it in such direction that it was not being lifted up perpendicularly, but being pulled against the forward cross-beam. From any of these conditions it would result that if, by extra power, the fore-and-after was heaved up, the adjoining structure would be disturbed. If the fore-and-after resisted the pull because it was too long for that place, and had been forced down, then the cross-beam would spring out from the adjoining fore-and-after resting upon it; if it was because the end had caught against the end of the adjoining fore-and-after, then that fore-and-after would be lifted up out of place; and, if it was because the pull from the fall was not in the line in which it could be lifted,

then some adjoining cross-beam was sure to be more or less disturbed, and the stability of the hatch covers endangered. These dangers are not the result of secret defects, but perfectly apparent when an extra strain is necessary to pull out any hatch beam, which should come out without any more resistance than its own weight. This obvious danger should surely suggest to a man standing on the adjacent hatch cover, over an opening 30 feet deep, that he was assuming a great needless risk in remaining there. Granting that, although it is dangerous to stand on the hatch covers at any time when the fore-and-afters and cross-beams are being lifted out, stevedores and seamen do it because they are in the habit of taking such risks, and shipowners know they take the risk, and should, therefore, be the more careful to protect them, still I think it clearly a different thing when the man sees right before him that the beam will not come out, and he himself calls for extra steam power to heave it out. If he stands then in the place of danger, he does so in spite of a clear warning; and when Dombroska saw that the fore-and-after, for some reason, was not coming out as it should, he had full opportunity to step back before calling for more steam, and, if he had done so, he would have been out of danger. He had the warning, and he had the opportunity to avoid the danger which his own order produced. The proximate cause of his fatal fall was, not that the cross-beam was misplaced, and the fore-and-after forced into the socket, for that did not affect the safety of the structure; but the immediate cause was that, in taking the structure apart, he stood in a place of danger, and applied an extra strain of the steam winch, calculated to make the structure dangerous to stand on."

For both these reasons, the libelant's right to recover must be denied. A decree may be entered dismissing the libel.